UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ANTHONY W. CARRELS,                        Civil No. 13-1736 (MJD/FLN)

              Plaintiff,

       v.                                  **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

              Defendant.
_____

Jeffrey D. Schiek, Philip G. Villaume for Plaintiff.
Ann M. Bildtsen, Assistant United States Attorney, for Defendant.
_____

       Plaintiff Anthony W. Carrels (Carrels) seeks judicial review of the final decision of the

Commissioner of Social Security, who denied his application for Disability Insurance Benefits.

The matter was referred to the undersigned United States Magistrate Judge for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction

over the claim pursuant to 42 U.S.C. § 405(g) and Fed. R. Civ. P. 73. The parties have submitted

cross motions for summary judgment. ECF Nos. 8, 10. For the reasons that follow, it is this

Court's recommendation that both motions be **GRANTED in part and DENIED in part.**

## I. INTRODUCTION

       Carrels applied for Disability Insurance Benefits on November 23, 2010, alleging a

disability onset date of February 26, 2008. Administrative Record (hereinafter "AR") 145.

Carrels' application was denied initially and again on reconsideration. AR 77, 83. Carrels then

filed a request for a hearing, which was held on May 21, 2012. AR 32, 86. The Administrative

Law Judge (hereinafter "ALJ") denied Carrels' application for benefits in a decision issued June

6, 2012. AR 14. Carrels appealed the ALJ's decision, and the Appeals Council denied Carrels' request for review. AR 1, 12. On July 3, 2013, Carrels commenced this action seeking reversal and remand of the ALJ's decision. Compl., ECF No. 1. Carrels and the Commissioner now both move for summary judgment. Mot. for Summ. J., ECF Nos. 8, 10.

## II. STATEMENT OF FACTS

### A.    Background.

Carrels is a 55-year-old man who last held substantial gainful employment as a carpenter. AR 145, 184. Carrels was 48 years old at the time of the alleged onset of his disability on February 26, 2008, and 52 years old at the time of the hearing on May 21, 2012. AR 145. Carrels' past relevant work experience consists entirely of working as a carpenter at a construction company *Id*. In February 2008, while at work, Carrels fell from a height of three to five feet off of a scaffolding structure, striking his head. AR 367. Carrels briefly lost consciousness and was transported to the emergency room. *Id*. As a result of the fall, Carrels suffered a variety of injuries. AR 380-81.

Carrels returned to work sometime after the incident, working about two hours a day three, non-consecutive, days a week. AR 40. By June 2009, Carrels had progressed to four hours a day, and by October 2010, he was working three eight-hour days, on occasion consecutively. AR 401, 566. Carrels' employment was terminated in December 2010. AR 42.

Carrels' asserts that he is disabled due to (1) short term memory loss; (2) shoulder injuries; (3) wrist injuries; (4) hip injuries; (5) depression; (6) lack of comprehension; (7) headaches; (8) sleepiness; (9) anger; (10) problems driving; and (11) a combination of these impairments. AR 183.

**B.**     **Medical evidence.**

**1.  Initial accident and recovery: February 2008 to March 2009.**

On the date of the accident, February 26, 2008, Carrels was diagnosed with injuries to the head ("traumatic brain injury, closed, with left temporal lobe epidural hematoma and contusion of the right temporal lobe"), facial fractures ("multiple facial fractures including left orbital hematoma"), and a fractured wrist ("comminuted left distal radius intra-articular fracture") by Dr. Ballinger. AR 381. Carrels remained in the hospital for three days. AR 377, 381.

On March 25, 2008, Carrels visited Dr. Thompson due to frequent headaches. AR 367-68. Dr. Thompson determined that Carrels had vertigo, but assuming treatment of the vertigo, Dr. Thompson saw "nothing from the traumatic brain injury that will limit him" in his return to work. AR 368. Regarding the headaches, Dr. Thompson recommended taking eight Tylenol a day and eating soft foods. *Id.* Six days later, Carrels returned to the Neurosurgery Division of the Mayo Clinic for a check-up regarding his brain injuries. AR 363. Dr. Utter's diagnosis was a "mild, closed head injury" and stated that Carrels was "making a reasonable recovery" and "doing well from a neurological standpoint." *Id.*

On April 11, 2008, Carrels had a check-up regarding his wrist and neck injuries with Dr. Elhassan, a hand, wrist, and arm expert. AR 361. Dr. Elhassan concluded that Carrels' fractured wrist was healing slowly "because of the history of smoking." *Id*. Additionally, Dr. Elhassan noted that Carrels' shoulder pain might be a supraspinatus tear or a subscapularis tear. *Id*. Two weeks later, an MRI confirmed both tears had occurred and shortly thereafter Carrels had shoulder surgery. AR 336, 359-60.

In October 2008, Carrels first saw Dr. Allen Brown,[1] a specialist in traumatic brain injury impairment. AR 335. At the meeting Dr. Brown suggested that Carrels take over-the-counter pain medication and gradually return to work; Dr. Brown anticipated that Carrels "would be ready to resume his vocation," despite remaining symptoms which included headaches, tinnitus, and irritability. AR 336.

In November 2008, at the request of Dr. Brown, Carrels saw a neuropsychologist, Dr. Smigielski, who observed that Carrels had "mild, but clinically significant difficulties in the neurocognitive domain." AR 326-27. Dr. Smigielski also stated that Carrels showed evidence of depression, heightened irritability, and decreased patience. *Id*. A Patient Health Questionnaire [hereinafter "PHQ"] was administered, and Carrels was classified as having "moderate to moderately severe depressive symptoms." AR 327. Additionally, the Montreal Cognitive Assessment was completed, and Carrels identified as having a "mild but clinically significant problem." *Id*. Dr. Smigielski recommended that Carrels undergo a comprehensive neuropsychological evaluation. *Id.*

On January 13, 2009, Dr. Smigielski performed the neuropsychological evaluation of Carrels, reporting that Carrels was "likely experiencing mild residual neurocognitive and neuropsychological consequences." AR 556. He further remarked that these consequences while "not likely to be . . . disabling for the patient, they are nonetheless likely to be the source of some interference in functioning in more demanding circumstances." *Id*. Quantitatively, Carrels obtained a full scale IQ score of 75, placing him in the 4th to 5th percentile. AR 554-55. A formal diagnosis was pronounced: cognitive disorder secondary to brain injury. AR 557.

Shortly thereafter, on January 22, 2009, Carrels began a work-hardening program, which consisted of aerobic conditioning, weight training, and stretching. AR 524. Carrels returned to

---

[1]     The Commissioner and the ALJ incorrectly identified Dr. Allen Brown as "Alan Brown."

Dr. Smigielski on February 18, 2009. AR 491-92. While Carrels' depression symptoms had decreased to mild to moderate, Dr. Smigielski expanded Carrels' psychological diagnosis to include adjustment disorder with depressed mood. *Id.*

**2.   Return to work: March 2009 to December 2010.**

On March 24, 2009, one of Carrels' treating physicians, Dr. Gelfman,[2] noted that Carrels was doing "extremely well from a physical standpoint" and that he would not "place [Carrels] on any specific restrictions from a physical standpoint." AR 436. However, on April 14, 2009, Dr. Smigielski and Dr. Brown, among others, discussed Carrels' mental restrictions and decided that he should initially be limited to six hours of work per week. AR 427, 432.

On August 14, 2009, Carrels followed-up with Dr. Brown. AR 647. Carrels had been working 4 hours a day for three, non-consecutive days a week. *Id.* Carrels denied that he was having any work-performance problems, and Dr. Brown discussed with him methods by which Carrels could increase his stamina and endurance, as fatigue at work was an occasional issue. *Id.* By November, 2009, Carrels had increased his hours per day to 6, but developed hip pain and went to see Dr. Gelfman. AR 611. Dr. Gelfman diagnosed Carrels with "right greater trochanteric bursitis." AR 611. Dr. Gelfman prescribed Naproxen and recommended that Carrels ice his hip and stretch. *Id.* Carrels returned to Dr. Gelfman in April, 2010 concerning the same hip pain, and Dr. Gelfman referred him to physical therapy. AR 579.

In January 2010, Carrels returned to Dr. Smigielski. Carrels complained of mental fatigue and lack of energy, and Dr. Smigielski noted that Carrels was experiencing mood problems. AR 591-92. The PHQ classified Carrels as having moderate depression and on the Montreal Cognitive Assessment, Carrels displayed significant memory difficulties. *Id.* Dr. Smigielski diagnosed Carrels with (1) cognitive disorder NOS and (2) brain injury without skull fracture,

---

[2]     The ALJ and Defendant incorrectly identified Dr. Gelfman as "Dr. Geffman" and sometimes "Dr. Geffen."

late effects. AR 590. Dr. Smigielski determined that Carrels could return to work at 18 hours per week beginning the following week. AR 589.

By May 11, 2010, Carrels experienced major difficulties with his work schedule. AR 577. On a visit to Dr. Brown, Carrels reported that he was having significant trouble tolerating his work schedule and that his "circumstances contribute to problems at home." *Id*. Dr. Brown discussed alternative options with Carrels, such as workers compensation and disability. *Id*. Two months later, Carrels returned to Dr. Brown and reported that "things are stable." AR 574. Carrels attempted to work three full (non-consecutive) days at that time, but stated he was rarely able to, because he just "knew when he needed to stop." *Id*. On September 3, 2010, Carrels underwent surgery on his wrist for carpal tunnel syndrome. AR 534.

In late October 2010, Carrels went for a check-up with Dr. Brown. AR 569. Carrels reported things were stable, that he had been working three, eight hours day each week, and that he had even worked consecutive days, which caused him "to sleep all weekend." *Id*. At this point Carrels had prescriptions to Naproxen, Vicodin, Lortab, and Methylphenidate. *Id.*

### 3. Carrels' Termination: December 2010-May 2011.

In December 2010, Carrels again saw Dr. Smigielski who noted that Carrels was suffering from clinically active depression. AR 567. Carrels felt his difficulties were "not entirely related to mood but reflect difficulties with brain functioning." AR 566. Dr. Smigielski classified Carrels as having moderate to moderately severe depression. AR 567. Dr. Smigielski and Carrels discussed a plan and Carrels agreed to take anti-depressants for a trial period, but expressed a preference for waiting a few weeks so any side effects would not interfere with work. *Id*. By December 22, however, concerns about Carrels' ability to maintain a job arose. AR 674. Carrels reported that he did not always meet his goal of three, eight-hour days. *Id*. Recently

Carrels' employer had told him to stay home because the demands of Carrels' work were not compatible with his carpal tunnel syndrome; Carrels also experienced continuous pain and fatigue. *Id*. Additionally, on November 11, 2010, Dr. Elhassan had implemented a permanent twenty-pound lifting restriction that Carrels had not yet shared with his employer. *Id.* After sharing the restrictions with his employer, Carrels was terminated. AR 40.

On February 15-16, 2011, Carrels visited Daniel Neveau, OT, in order to obtain a Functional Capacity Evaluation. AR 666. Neveau determined that Carrels had slight to no restrictions regarding sitting, standing, and kneeling, but there was some restriction regarding overhead reaching (weighted or non-weighted), forward bending, standing, crawling, crouching, squatting, walking, and stair climbing. AR 672. Neveau further concluded that Carrels' balance was restricted and that Carrels needed external support when working at lower levels. *Id*. Ultimately, Neveau determined that Carrels could not work as a carpenter. *Id*.

On May 24, 2011, Carrels again visited Dr. Gelfman. AR 732. Dr. Gelfman summarized Carrels' physical ailments as "discomfort around the left shoulder and the right hip, but these are relatively minor compared with his left wrist which continues to be quite bothersome." *Id*. Regarding the mental ailments, Dr. Gelfman reported that Carrels "has struggled with recovery from his brain injury. In addition to the cognitive impairment, he was diagnosed with depression which is currently under treatment." *Id*. Dr. Gelfman defined the cognitive impairment as "mild impairment . . . able to live independently but requiring supervision with executive functions." AR 732. Dr. Gelfman classified the depression as "intermittent emotional disturbances requiring intervention by a caregiver are only present under stressful situations . . . ." AR 733.

### 4.   Residual Functional Capacity Reports.

Both Dr. Gelfman and Dr. Brown completed Residual Functional Capacity Questionnaires for Carrels. AR 681, 708. Dr. Gelfman characterized the symptoms as "difficulty with memory and mood. Some pain." AR 708. Dr. Gelfman concluded that Carrels was capable of low stress work, that he had some restrictions on standing/walking, some manipulative restrictions, and could lift 20 pounds occasionally. AR 709-11. Dr. Gelfman also stated that Carrels was unable to work 40 hours/week and would likely miss more than four days per month. AR 710-11.

Dr. Brown, on March 2, 2011, described Carrels symptoms as "left wrist/hand pain and weakness; thinking and memory trouble; fatigue; mood; anxiety; gait unsteadiness." AR 681. Dr. Brown stated there were some restrictions with sitting and standing/walking and also that Carrels required a sit/stand option. AR 683. Dr. Brown listed a variety of postural and manipulative restrictions and speculated that Carrels would be absent from work about four days a month. AR 682-84.

Benetta Johnson, Ph.D, was the state agency psychologist for the case. AR 68. Dr. Johnson determined that Carrels had five severe impairments: cerebral trauma, carpal tunnel syndrome, sprains and strains, organic brain syndrome, and affective disorder. AR 67. She further determined that none of these impairments were sufficient to be considered disabling. AR 67. Dr. Johnson, however, did opine that Carrels appeared credible, and that the activities he listed were not significantly limited in relation to his alleged symptoms. AR 68. She completed a mental residual capacity form, and concluded that while Carrels had some memory concerns, he could execute simple tasks and manage light stress. AR 70. She also noted that his ability to complete a normal workday or workweek was moderately limited. AR 70.

Isaac Marsolek, M.D., was the state agency physician who completed a physical residual capacity form. AR 68-69. Dr. Marsolek noted some "exertional limitations," including moderate lifting limitations, slight limitations on sitting and standing/walking, and no manipulative restrictions. *Id.* He also concluded that Carrels was reasonably credible. AR 69. The opinions of Dr. Johnson and Dr. Marsolek were affirmed by Dr. Conroe and Dr. Anderson in March 2011. AR 690, 694.

**C.      Administrative hearing.**

The administrative hearing took place on May 21, 2012. AR 32. Attorney Mr. Russell represented Carrels at the hearing and Carrels testified on his own behalf. AR 32, 35.

**1.   Mr. Carrels' testimony.**

At the hearing, Carrels testified that he had a lot of pain in his wrist and shoulder, that he tired quickly, and had problems staying awake, and that he had poor memory. AR 36. When asked if he had problems walking and standing, he said "I can't walk real far" and that he got dizzy if he bent down quickly. AR 37. Carrels also stated that his wrist pain effectively prevented him from lifting objects with his left hand/wrist. *Id.* He further testified that the primary reason why he would be prevented from doing a simple job was because of his poor memory. AR 38.

When asked about his work experience, Carrels said that he had worked for the same company for 30 years building houses and running equipment. AR 40. Carrels testified that after his accident he returned to work sometime in 2009, initially for an hour or two a day. *Id.* Carrels testified that he completed simple tasks in the presence of others and that co-workers told him he was making mistakes. AR 41-42. Initially, Carrels performed some heavy lifting, but his wrist pain increased and so he eventually ceased all heavy lifting. AR 41. Carrels reported leaving the job in December 2010, after which he began working in a bait shop. AR 42.

Regarding the bait shop job, Carrels testified that he places bait in buckets five to six hours a day for one or two days a week. *Id.* When asked about his ability to work more often, Carrels stated that working three consecutive days would cause him to "have a hard time remembering" and "get all flustered, confused," and that he would make mistakes. AR 43.

Carrels additionally testified about his daily routine, reporting that he watches significant amounts of television, does a little bit of vacuuming, and occasionally goes fishing. AR 37-38. Carrels stated that he cannot walk more than half a block without incurring severe hip pain and that he cannot grip, grab, or hold objects in his left hand without incurring severe wrist pain. AR 46-48. He did not report problems with his shoulder. AR 47. Carrels testified that he has two prescriptions for pain medications, but tries to take them as needed rather than every day. AR 50.

Carrels further testified regarding social difficulties he experienced. AR 44-45, 50. He noted that he has a hard time getting along with people, including his wife. AR 44-45. Carrels also noted a decrease in his social events and interactions. AR 50.

Finally, Carrels testified at length about his sleeping problems. AR 43, 45, 49. He stated that he falls asleep when sitting down during the day and that he was prescribed methylphenidate to keep him awake. AR 45. Carrels reported that the prescription helps him and that before he had the prescription he would sleep all day. AR 49. However, Carrels maintains that he still would sleep all day when work caused him to be unusually fatigued. AR 43.

**2. Medical expert's testimony.**

Dr. Steiner was the medical expert called upon to testify before the ALJ. AR 52. After listing the impairments in the record, Dr. Steiner determined that none of the physical injuries met or equaled any of the impairments listed in the regulations. AR 54. Dr. Steiner testified that Carrels would be limited to light lifting, light standing/walking, no overhead work, only

occasional power gripping with both hands, and only occasional grasping with the left wrist. AR 54.

### 3. Vocational expert's testimony.

Mitch Norman was the vocational expert ("VE") who testified at the hearing. AR 55. The ALJ posed the following hypothetical to the VE: 1) brief and superficial contact with others; 2) simple, one or two-step work activities; 3) limited to light physical exertion; 4) limited to occasional power gripping with both hands; 5) no overhead work; and 6) only occasional grasping with the left hand. AR 56. The VE, after testifying that a person who fit the above hypothetical could not be a carpenter, proceeded to name mail clerk and weld inspector as two positions that the stated limitations would not preclude. AR 56-57. When questioned by Carrels' attorney, the VE admitted that the positions could not accommodate direct supervision, four missed days per month, or a sit/stand option that required the worker to leave the immediate vicinity. AR 57-58.

### 4. The ALJ's decision.

In determining whether an individual is disabled, the ALJ follows a five-step sequential process established by the Social Security Administration. 20 C.F.R. § 404.1520. The claimant bears the burden of proof at the first four steps of the process. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). The first step requires that a claimant demonstrate that they are not engaged in a substantial gainful activity. 20 C.F.R § 404.1520(b). At step two of the examination, the claimant must show that they have a severe medically-determinable impairment. C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ considers whether the impairment(s) meet(s) or equal(s) one of the listed impairments under 20 C.F.R. § 404, sub pt. P, app. 1 (Listings). 20 C.F.R. § 404.1520(a)(4)(iii). At the fourth step, the

residual functional capacity (RFC) of the claimant is delineated, and it is determined whether the claimant is capable of doing their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows that he can no longer engage in past relevant work, the process moves to step five where the burden of proof shifts to the Commissioner. 20 C.F.R. § 404.1520(a)(4)(v). At this final step, the Commissioner is required to show that the claimant can perform other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

Here, the ALJ concluded that Carrels had not engaged in substantial gainful activity since the alleged onset of disability. AR 19. At step two, the ALJ found Carrels to have the following four severe impairments: degenerative joint disease with a history of fracture, obesity, status-post-traumatic brain injury organic mental disorder, and depressive disorder. *Id*. The ALJ concluded that Carrels' impairments did not meet or medically equal the severity of the listed impairments. *Id*. Next, the ALJ outlined Carrels' RFC:

> The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except no overhead work; only occasional bilateral power gripping; only occasional grasping with the left upper extremity; no complex or detailed job tasks; restricted to simple, one to [sic] step work activity; limited to brief and superficial [sic] with the public and coworkers (i.e. no intimate, direct contact with the public and coworkers).

AR 21-22. The ALJ further concluded that the restrictions listed above precluded the claimant from performing his only past relevant work, that of a carpenter. AR 25. At the final step, the ALJ heard the testimony of a vocational expert and concluded that Carrels could perform other work that existed in significant numbers in the national economy, such as mail clerk or weld inspector. AR 26. Therefore, the ALJ found that Carrels was not disabled and, correspondingly, not entitled to benefits. AR 27.

### III. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505. "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether "the Commissioner's findings are supported by substantial evidence of the record as a whole." *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) (quoting *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)). Substantial evidence means "more than a mere scintilla;" it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In reviewing whether the ALJ's determination is based on substantial evidence, the Court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Prosch*, 201 F.3d at 1012 (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

A court, however, may not reverse merely because substantial evidence would have supported the alternative decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000). "As long as substantial evidence in the record supports the Commissioner's decision, we may not

reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). Therefore, the Court's review of the ALJ's factual determinations is deferential and the evidence is neither reweighed, nor the factual record reviewed de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).

## IV. ANALYSIS

Carrels argues that the ALJ erred by (1) failing to properly develop the record with regard to Carrels' alleged mental health impairments; (2) improperly finding Carrels not credible; (3) improperly rejecting the opinions of Carrels' treating providers and failing to make a RFC determination based on substantial evidence; and (4) failing to meet its burden to show Carrels can do other work within the national economy. Pl.'s Mot. 1, ECF No. 9 at 1. The Court agrees with Carrels regarding the third and fourth issues presented.

**A.      Substantial evidence supports the ALJ's decision to not further develop the record as it pertained to Carrels' mental impairments.**

Carrels contends that the ALJ failed to adequately develop the record on Carrels' mental impairments. Pl.'s Mem. in Supp. of Summ. J. 11, ECF No. 9. The ALJ is required to order further medical examinations and tests if the medical records presented to him do not provide sufficient medical evidence to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986) (citation omitted). "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) (quoting *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984)). A plaintiff seeking to reverse an ALJ's decision due to the failure to adequately develop the record bears a heavy burden: a

plaintiff must show both a failure to develop necessary evidence and unfairness or prejudice from that failure. *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001).

Carrels contends that the failure of the ALJ to order a neuropsychological evaluation, despite the claimant's request for such evaluation, is error and that the alleged error was harmful. ECF No. 9 at 11-13. "The ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004). Here, the ALJ relied on extensive neuropsychological testing, Carrels' self-reported daily activities, and state agency findings when evaluating Carrels' mental impairments. AR 21, 23. Accordingly, the medical records available to the ALJ provided sufficient medical evidence in order for the ALJ to make an informed conclusion.

Carrels additionally argues that the neuropsychological evidence is outdated and that his cognitive functioning has declined since the date of previous testing. *Id*. at 13. Thus, Carrels maintains that a new neuropsychological evaluation is required. *Id*. Carrels refers to cognitive tests performed by Dr. Smigielski in January 2010 which showed a decreased score on the Montreal Cognitive Assessment and the depression screen. AR 591. Yet that same day, Dr. Brown and Dr. Smigielski recommended that the patient resume working 18 hours per week with the hope that his hours could be increased. AR 593. Both Dr. Brown and Dr. Smigielski expressed hope that Carrels could increase his weekly hours in the future. *Id*.; AR 589. Additionally, Carrels' testimony and the record as a whole do not establish that his ability to engage in his daily activities or his work has diminished since the onset of his impairment. AR 32-55. Substantial evidence supports the notion that Carrels' mental impairments have remained

relatively constant, and therefore the ALJ did not improperly fail to order an additional neuropsychological evaluation.

**B.      Substantial evidence exists to justify the ALJ's assessment of Mr. Carrel's credibility.**

Carrels argues that the "ALJ improperly evaluated [his] pain and fatigue, resulting in an erroneous finding [that] Carrels is not credible." ECF No. 9 at 14.

A "claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment . . . [but] [t]he adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). When analyzing a claimant's subjective complaints, the ALJ must consider the following credibility factors: (1) daily activities; (2) duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. *Id.* Subjective complaints may be disregarded if there are inconsistencies in the evidence as a whole. *Id.* Moreover, "the credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. . . .  This court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Sandry v. Astrue*, 2013 WL 1314452, at *10 (D. Minn. Feb. 27, 2013) (internal citations and quotations omitted).

In finding the claimant not credible, the ALJ stated:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they [are] not consistent with the objective evidence and other evidence, as defined in 20 C.F.R. § 404.1529(c) and *SSR* 96-7p, and as discussed thoroughly below.

AR 22.

Carrels' first argument is that the ALJ erred in his credibility assessment by finding "no objective findings, signs, or diagnoses associated with [right hip pain]." ECF No. 9 at 14. While Carrels did visit Dr. Gelfman for his right hip pain, the medical evidence does not support the symptoms alleged. AR 46. Carrels testified at the hearing that he could only walk "maybe a half a block" without needing to stop or experiencing severe pain. *Id.* Yet, Dr. Gelfman noted that Carrels had not been exercising regularly, and therefore, Dr. Gelfman recommended a refresher in physical therapy. AR 579. That was the extent of the remedy Dr. Gelfman thought necessary. Carrels' pain medication in November 2009 was primarily for his wrist pain and no further tests or remedies were planned for his hip. AR 579, 611. The RFC questionnaires provided by Dr. Brown and Dr. Gelfman stated that Carrels could walk two or three city blocks. AR 682, 709. Given the history of the treatment and the limitations opined by Carrels' doctors, substantial evidence supports the ALJ's determination that Carrels' testimony about the "intensity, persistence, and limiting effects" of his hip injury was not credible. AR 23-24.

Carrels also argues that the ALJ ignored his long-term participation in occupational therapy and that the absence of inpatient hospitalization is irrelevant. ECF No. 9 at 19-20. The ALJ wrote, "[a]lthough the claimant participated in cognitive therapy following the injury, there is no evidence of subsequent psychiatric hospitalization." AR 23. Clearly, the ALJ did not ignore Carrels' therapeutic history. Furthermore, the history of treatment, or lack thereof, is a factor that the ALJ is entitled to consider and is not irrelevant. 20 C.F.R. § 404.1529(c)(3).

Finally, Carrels contends that the ALJ improperly evaluated his daily and work activities. AR 20-22. The ALJ stated, "the claimant has described daily activities that are not nearly limited to the extent one would expect, given the complaints of disabling symptoms and limitations." AR

24. During the hearing, Carrels alleged that he could only walk "maybe half a block", that he experienced constant wrist pain, that he could sleep for 24 hours if not awakened, and that his memory was so poor that he would have trouble with single step jobs. AR 38, 46-47, 49. Even a favorable interpretation of Carrels' admitted daily activities is not consistent with the complaints that he alleged at the hearing. *See* ECF No. 9 at 21-22. Carrels has indisputably admitted to occasionally driving, doing chores, walking, working, and fishing. *Id.* There is substantial evidence to support the manner in which the ALJ resolved the discrepancy between the conditions Carrels alleged and the activities in which he engaged. As such, the Court finds no error in the ALJ's evaluation of Carrels' daily and work activities.

**C.     Substantial evidence does not support the weight given to the opinions of Carrels' treating physicians.**

**1.     The ALJ failed to give treating physicians substantial weight as required by 20 C.F.R. § 404.1527(c)(2).**

Carrels argues that the ALJ rejected the opinions of Dr. Brown and Dr. Gelfman and that the opinion of Dr. Smigielski was partially ignored. ECF No. 9 at 23. A treating physician's opinion is entitled to *substantial* weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). The opinions are given controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are consistent with the other substantial evidence in the record as a whole. 20 C.F.R. § 404.1527(c)(2); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). When giving less than controlling weight to an opinion, an ALJ "must always give good reason for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel*, 201 F.3d 1010, 1018 (8th Cir. 2000).

The ALJ's failure to accord Carrels' treating physicians proper weight is epitomized by the following excerpt from the ALJ decision: "[T]he physical restrictions of [sic] Dr. Brown

describes are at least somewhat consistent with the objective evidence, including clinical findings, signs, and the claimant's course of treatment. Therefore, the undersigned has accorded it some weight." AR 25. Not only has the ALJ failed to give Dr. Brown controlling weight, the ALJ has not even granted Dr. Brown substantial weight. *Id.* Additionally, the ALJ provides no reason for awarding Dr. Brown's opinion only some weight. *Id.* The ALJ merely finds Dr. Brown's opinion at least somewhat consistent with the overall record. The ALJ does not state that Dr. Brown's opinion is inconsistent with the record, nor is it clear with what evidence Dr. Brown's opinion might be inconsistent. Dr. Brown's opinion has not received due deference.

Likewise the treatment of Dr. Gelfman's opinion is also improper. AR 24. The ALJ states, "for the most part, Dr. Geffman's [sic] opinion is consistent with the light exertional restrictions expressed above, and the undersigned has given some weight, as those restrictions are supported by the evidence." *Id*. When opinions are consistent with and supported by the evidence, they are to be given controlling weight. 20 C.F.R. § 404.1527(c)(2). Here, Dr. Gelfman's opinion is given *some* weight, despite meeting the requirements above. AR 24.

### 2. The ALJ failed to cite to substantial evidence when disregarding or minimizing treating physicians' opinions.

Regarding both doctors' opinion that Carrels cannot consistently work 40 hours each week, it is not clear why the ALJ does not credit the opinion. AR 24-25. The overall record chronicles an attempt by Carrels to return to full-time work, with consistent setbacks (mentally and physically) that ultimately preclude a successful return to work. AR 393, 397, 404, 412, 577, 589, 674, 682, 709. The ALJ has failed to state upon what substantial evidence he bases his belief that Carrels can work full-time. AR 24-25. Carrels has not worked close to full-time since the time of the injury, and Carrels treating physicians believe he is not capable of completing a full-time job. *Id.* The only evidence in the record that supports the notion that he can work full-

time are the evaluations done by the state agency doctors, and these opinions do not constitute substantial evidence. *Hancock v. Sec'y of Dept. of Health, Educ. and Welfare*, 603 F.2d 739, 740 (8th Cir. 1979) (stating that the medical opinion of a consulting physician who examined the plaintiff once did not constitute substantial) (citations omitted).

### 3.  The ALJ's should properly weigh the opinion of Dr. Smigielski.

Carrels additionally argues that the ALJ's failed to directly address the opinion of Dr. Smigielski. ECF No. 9 at 23. While the ALJ did discuss some of Dr. Smigielski's work, he is named in the report. *See* AR 23. The ALJ only cursorily discussed Dr. Smigielski's opinion, misstated part of it, and did not determine what weight it carried. AR 23. Dr. Smigielski is Carrels' primary neuropsychologist and because mental limitations play a prominent role in Carrels' alleged disability, Dr. Smigielski's opinion requires further discussion and a determination of the weight it is assigned.[3]

### 4.  The ALJ's should reevaluate the weight accorded to Dr. Steiner.

Carrels next disputes the weight given to non-treating physician, Dr. Steiner. ECF No. 9 at 26. The ALJ gives Dr. Steiner "great weight." AR 24. The Eighth Circuit has stated, "the report of a consulting physician who examined the patient once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the claimant's treating physician." *Hancock*, 603 F.2d at 740. Therefore, Carrels has argued that Dr. Steiner's opinion

---

[3]   Carrels also maintains that the ALJ did not incorporate certain aspects of the opinion given by treating occupational therapist, Daniel Neveau. Specifically, the only argument Carrels brings pertaining to Mr. Neveau is the ALJ's failure to impute a necessary sit/stand option from Mr. Neveau's report. *See* ECF No. 9 at 26. The ALJ states that Neveau's evaluation conducted in February 2011 is "consistent with the limitations expressed in the residual functional capacity." AR 23. Carrels argues that Mr. Neveau's report required a sit/stand option, however, such a conclusion is not clear from the report. ECF No. 9 at 26. Mr. Neveau used the word "recommended" instead of "required," described limitations as "occasional," and did not detail whether normal breaks would be sufficient.  AR 670 (stating "it is recommended that the client alternate between sitting, standing, and walking."). Accordingly, the Court cannot conclude from this language that Mr. Neveau required Carrels to have a sit/stand option. The ALJ properly evaluated Mr. Neveau's opinion.

should not be given great weight. ECF No. 9 at 26. Furthermore, Dr. Steiner's opinion cannot constitute substantial evidence on its own. Hancock, 603 F.2d at 740. The weight given to the opinion of Dr. Steiner therefore must be determined on remand after the treating physicians' opinions are more thoroughly evaluated and discussed. Dr. Steiner's opinion, within the context of the overall record, must be evaluated again.

**D.     The Commissioner failed to satisfy its burden of showing that Carrels can perform alternative jobs within the national economy.**

Mr. Carrels raises two arguments with respect to this issue: 1) that because the ALJ improperly calculated Carrels' RFC, the testimony of the VE relied upon by the ALJ does not constitute substantial evidence upon which to base a denial of benefits and 2) that even if the ALJ's RFC determination was accurate, the VE did not list jobs that comported with the restrictions delineated. ECF No. 9 at 29-31.

Testimony from a vocational expert, which was based on a properly phrased hypothetical question, constitutes substantial evidence supporting the ALJ's decision. *Roe*, 92 F.3d at 675. "However, where an ALJ improperly rejects the opinion of a treating physician . . . the vocational expert's testimony that jobs exist for the claimant does not constitute substantial evidence on the record as a whole where the vocational expert's testimony does not reflect the improperly rejected evidence." *Wiekamp v. Apfel*, 116 F.Supp.2d 1056, 1074 (N.D. Iowa 2000) (citing *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir.2000)); *see also Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir.1999) (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion). Here, the hypothetical posed to the VE relied on the ALJ's determination of Carrels' RFC, which this Court has found improperly weighed the opinion of Carrels' treating physicians. Therefore, the VE's opinion cannot constitute substantial evidence. In accordance with the recommended remand, the Court need not

evaluate Carrels secondary argument on whether the alternative positions suggested by the VE were consistent with requirements set out in the RFC.

## V. CONCLUSION

The Court concludes that the record did not need to be developed further regarding Carrels' mental impairments and that substantial evidence supported the ALJ's determination that Carrels was not credible. In developing the RFC, however, the ALJ, without substantial evidence to support his decision, decreased the weight given to Carrels' treating physicians, Dr. Brown and Dr. Gelfman, and did not adequately discuss the opinion of Dr. Smigielski. Accordingly, the Commissioner's decision should be reversed and remanded. On remand, the ALJ must fully consider the working limitations described by Carrels' treating physicians. If the ALJ disagrees with those limitations, he must provide specific, detailed reasons for doing so.

## VI. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (ECF No. 8) be **GRANTED in part and DENIED in part**;

2. Defendant's Motion for Summary Judgment (ECF No. 10) be **GRANTED in part and DENIED in part**;

3. The Commissioner's decision be **REVERSED** and the case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation.

DATED: August 11, 2014                    *s/Franklin L. Noel*
                                          FRANKLIN L. NOEL
                                          United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 25, 2014** written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.